Take up CORE Communications v. Verizon. And Mr. Gleeson, do you want to start us off here? Thank you, Your Honor. May it please the CORE. I represent CORE Communications in this case. My name is Ralph Gleeson, and sitting at the Council table with me is Chris Vandiverg, who is Internal Counsel for CORE. We are here to ask this Court to find that the District Court was correct when it found that an exculpatory clause in the contract between CORE and Verizon did not apply and erred in reversing itself, and also erred in finding that CORE may not succeed in its tort claims against Verizon. I think that this Court is well aware of the procedural history of this case, but this Court has found in 2010 that Verizon breached the Interconnection Agreement, and the question is whether or not CORE may receive damages from its breach. Verizon argues that there is an exculpatory clause in Section 26 of the Interconnection Agreement which prevents CORE from receiving compensatory damages, which are the bulk of CORE's damages in this case. Now, I want to make the Court aware that this case reaches beyond a disagreement between just CORE and Verizon. Verizon is arguing that this exculpatory clause keeps it from having to pay any compensatory damages for a failure to interconnect, which is the basic, what it has to do under this contract is interconnect. Then it has to provide services and accept services from the competitive local exchange carrier. If it does not have to pay damages, then Verizon or any incumbent LEC may choose just not to interconnect without fear of having to pay anything for its failure to interconnect, and that is obviously an illogical conclusion to this case, but it could happen. It doesn't have to be Verizon. It could be any ILEC, and that would frustrate the statute and would stop the competition that the statute is designed to encourage. However, the reason that we're arguing that that exculpatory clause doesn't apply are three reasons. One, a reading of the statute itself shows that it does not apply in a case when interconnection is, when the duty to interconnect is breached. Second, Maryland law does not allow an exculpatory clause in this case, though it is, exculpatory clauses are allowed under Maryland law. And lastly, Verizon failed to plead this exculpatory agreement, which is an affirmative avoidance and required to be pled by Rule 8. Your Honor, this court found that Verizon breached the contract by failing to interconnect under 27.1 of the agreement. Verizon is arguing that the exculpatory clause in Section 26.2 of the agreement applies. The reading 27.1, it has its own remedy for a breach, and that is in Section 27.3. And 27.3 says that the penalties that might be appropriate shall be resolved through a competent process to a court of competent jurisdiction. Now, I have left out some parts of that, but it does say that. Now, Verizon has argued, well, it also says right before that you can go to a court of competent jurisdiction to redress your issue, you have to have a statistically significant error rate and reports of errors in order to be able to go to a court under 27.3. Well, again, we're not talking about the traffic back and forth over the network. We're talking about forming the network, the interconnection. And because we're talking about forming the interconnection, and this court found that they breached that interconnection, Verizon, in this case, breached the contract 100% of the time, and that is a statistically significant error rate. This is, again, a binary system. The interconnection happens or it doesn't, and there can be no statistically significant or statistical analysis of that. So the 27.3 section is what applies here, not the 26.2, and Verizon's argument fails, and we should be allowed to go forward. Further, if one reads Section 26, the first part, 26.1, accepts out 27, which is exactly where this court found the breach. Second, the interconnection, 26.2 talks about failures in telecommunication services. Interconnection is not a telecommunication service. That's GlobalNaps versus Bell Atlantic New Jersey, which is predecessor to Verizon. It's also competitive telecom versus FCC. They have ruled that interconnection is not a telecommunication service. It's the traffic, the flow of traffic and the termination of traffic that is a service. Verizon has argued that, okay, we agree that the cases say that it's not a telecommunication service and that our courts have said that that has a specific definition, but it is nonetheless a service. Well, we disagree with that, Your Honors. Think of it as CORE living on one side of a river and Verizon living on the other, and the interconnection is a bridge. One way to look at it is that they have to work together to build a bridge, and the government and the interconnection agreement, government through statute and interconnection agreement itself, say that they have to build that bridge. So it is not a service that one provides to the other. Yes, sir. One of the initial reservations I had about your case was these darn tort claims. And I don't know how you think you can bring those because this relationship is framed by a contract, and it's a very highly reticulated contract, and it's a comprehensive contract in which the parties appear to contemplate all sorts of eventualities. And, you know, the breach of a contract just isn't a tort. And yet over and over again we have these tort claims, and part of the reason parties contract is to give some definition and framework to their obligations so they'll know what they can expect if they go into court. So why couldn't you just proceed with your contract claim  and talk about the contractual remedies without bringing in all these torts? Your Honor, you're asking why any plaintiff might give up causes of action which it believes it fairly holds under the law, and we do, which might also prevent a competitor from doing that type of act in the future. If we can win on a tort claim and convince a jury that there was malice and thereby get punitive damages, we may stop Verizon and other ILECs from dealing with this small CLEC. You get consequential damages if there's malice. Well. You're going to mean the consequential damages are pretty significant in their own right. Well, the consequential damages are what we're here to argue about in the contract portion of this claim. You're correct, Your Honor. The only thing we get extra for the torts, assuming that the contract case goes forward, the only thing we get extra is if we get punitive damages on the torts. But Maryland law controls. That's very troublesome when parties enter into contracts. It would upend commercial life if they thought that there was a breach of that contract, that they were subject to open-ended punitive damage. It destroys the very nature of contract, which is to provide some outer limits and some sort of definitions to the rights and obligations of each of the contracting parties. And then you just, you know, torts a wide-open area. It has its places, particularly injuries between strangers and particularly business injuries in the absence of a contract. But where you have a contract that's as detailed as this one is, and, you know, these were two business parties. They weren't naive. They were sophisticated business parties. They negotiated the contract. And then here we see these tort claims. I understand Your Honor's concern. They're also sophisticated parties with high-powered lawyers. Yes, Your Honor. However, they were not required to enter into this particular contract. They chose to enter into it because the way, as you remember, the way this happens is if you see a contract you like, you can say, I want that. So Verizon did that. What's the good of negotiating a contract and being represented by counsel if we're just going to have a breach become some kind of tort claim? I mean, why go through the exercise? Well, Your Honor, we're looking at Maryland law, and Maryland law says that you can have a tort claim if the breach is also a tort. But they have to be so intertwined that one cannot be viewed in isolation from the other. So the question isn't whether or not the breach arises. I don't understand the principle of limitation. Well, I understand, Your Honor. We're not saying that the breach is a tort. We're saying that them lying to us is a tort, that them concealing information from us is a tort. So the breach we can recover under. It's always carbuncle something else. We were misrepresented. Something was misrepresented to us in the course of the breach, and therefore the breach becomes a tort. I understand that. But in its finding, the tort. It's just hard to overestimate the havoc that this kind of thing would play with commercial relationships. And I don't understand it. And there are a lot of people, a lot of litigants, who come before the court and argue the contract. It sets a better atmosphere, and their arguments seem to be a whole lot more persuasive when they argue in terms of what they negotiated, in the terms of the written contract. And they present very effective cases. But these other things. And that's what I obviously led with this morning, Your Honor, was the contract. And I would tell you that if we were here looking at Fourth Circuit law, I would be reluctant to bring these tort claims. But we are here under Maryland law, and I believe that they're allowed, and this court has to look at this case, even given its reservations under Maryland law, which can allow them, given the facts, if the facts are correct, and the facts in this case. And as used in Verizon 2. Your Honor, we've got a contractual term that makes them liable for consequential damages in the event that there's malice, right? Yes, Your Honor. Now, you need to tell me factually why you think there's malice on the part of Verizon. Your Honor, Verizon refused to interconnect CORE quickly. No, they were specifically asked to. Verizon stated that they had a concern about equal in quality connection that they never presented to CORE until after the lawsuit was began, meaning not at the point. Why does that? Apparently an ordinary breach of contract and malice, they're not wanting the same thing, are they? No, Your Honor. You've got to show something more than an ordinary breach. Why did Verizon's conduct go above? I apologize, Your Honor. I want to say that for the breach, malice is not required, but intent is. So to the extent we're parsing, I don't mean to do that, but it can be important. Verizon's conduct, including Verizon telling CORE that it could not connect CORE at the locations requested because there was another customer of record. CORE specifically wrote a letter to Verizon asking who the customer or saying that we are going to find out who the customer record is so we can talk to them about allowing us in there. And then finding out later that CORE was the customer record shows. What was the response to the request to find out the identity of the other customer? Say again, sir. What was the response from Verizon? There was no response, Your Honor, much like our request to interconnect, much like our request to allow us into a loop connector, which they eventually said we didn't allow you to connect to because of lesser quality, but they just didn't respond and they just didn't connect. It is clear that they tried to delay. And how long did it take? Counsel, the question is to you as to why you, I'm not surprised that you're so timid. When you bring an action under Maryland law for a tort, the question to you is why are you here bothering the court with that? And you need to say why you are. How long did it take them? After they told you that there was a retail customer connected and you said, well, can you give me the name so perhaps we can negotiate? How long did it take for them? They never gave it to you. How long of a time was that over? Well, we got connected in four months, and it was two years later when the case was about to go to trial before the PSC when we found in discovery, and I say we, I was not involved in the case at the time, we found in discovery from one line on one page out of hundreds of documents that CORE was in fact a retail customer. From which you contend you can infer malice, correct? That is our contention, Your Honor. Right. Well, that's what you need to argue. You said to me you're timid about it. That's why you're here on the tort claim. Well, on the tort claims, you're right, Your Honor, and we believe that Verizon's conduct was reprehensible in this case. But your man Mingo kind of undercut you, didn't he? I don't believe so, Your Honor. I think that some of his testimony has been quoted by Verizon, but not all of it. He has said in – Quoted out of context? Well, not so much out of context, but not quoted without all of the context. He has said – He's your – Yes, sir. He is the president of the company and the main person, but he has said in the past that Verizon definitely intended to delay the case. He exculpated Verizon to a great extent. I don't believe that's correct, Your Honor. I don't want to argue with the court if that is your finding. But he has also said that Verizon specifically intended to delay the interconnection and that when asked about that, he said, if it looks like a duck and quacks like a duck, it's a duck, meaning if somebody is going this far out of their way not to connect us, when we ask to connect us and lying to us about it, they are intending to delay the connection. I see my time is up. I'll finish and rebut. In case the answer, I mean – Yes, sir. We can prove that. We'll find that. I don't believe he undercuts us at all. He basically just said that he agreed that he did not know what Verizon knew. But it's clear, and Verizon argues, that one section or one division of Verizon doesn't know what the other division is doing. The retail and the wholesale people don't know each other, and that's why we didn't tell you. That's fine until – Big corporations and things like the government, I mean – And that's fine, Your Honor, until August – Not everybody knows what everything is going on. And that's fine until August 20th of 1999. That is when Mr. Vandiver sent a letter to a corps saying, you've told us that there's a customer record. You've told us that it's somebody other than us. The two approaches was what, four to six months? Correct, Your Honor. We're not talking about a period of years or whatever? Not in this case, Your Honor. But if we're not allowed to go forward on contract claims – This is the one that we have to decide. Why is four to six months indicative of some sort of egregious misconduct? The court's already found the breach, that they have the misconduct and that they breached this case. We're not here about that. The question, again, when you get to the Maryland side of the law, is whether or not there was intentional. But it's not just intentional. It's public service. It's what does the contractor say, and did they bring it up in time because they did not raise this issue for 11 years? Thank you, Your Honor. Mr. Angstreich? Yes, Your Honor. Thank you. Thank you, Your Honors. I'd like to start where Mr. Gleaton did with Section 27.3. Those claims have been completely waived. After the judge ruled on reconsideration, Judge Motz, he said to the parties, I think it would be efficient for you to agree on the limited amount that CORE is entitled under my rulings so that you can appeal those rulings. But if you don't agree, and this is on page 3 of the special appendix, if you don't agree, please advise me. I will hold a conference to set a schedule for the remaining proceedings in this case. If CORE had any arguments about Section 27.3 and damages due to it under that section, that was the time to raise them. CORE didn't raise them. It agreed to a $1 judgment that it could appeal the rulings the judge actually reached. There is nothing in either of the summary judgments. That's just a sketch of an order that mirrored what the court ruled. They're not conceding to what – obviously the whole case was about damages. The judge said, listen, you need to sketch an order that will accurately mirror what I've ruled. You have to agree on that. You're saying because they put that in there, which reflected the judge ruling they waived damages? Your Honor, we had asked the judge on summary judgment. We said they have no evidence other than – Was he requesting you all to write an order, or was he requesting you to go settle? He was – I think what he was doing was requesting that – I think he figured – You're saying that thing was a settlement agreement. It wasn't a settlement agreement. They were litigating. He made a ruling and said you all come up with an order. Right. And that's what lawyers do. A lot of judges do that from the bench. Your Honor, if he – Rule and sell the lawyers to write up an order, conformity therewith. Your Honor, if he had thought – That doesn't mean they waived the right to pursue an appeal. I'll try one more time. The appeal might not be worth anything, but they have the right to try it. They have the right to appeal his ruling that the exculpatory, or Section 26.2, bars them from recovering consequential damages. They absolutely have the right to appeal that. But their claim goes beyond that. Their claim is that somehow, besides the consequential damages, and there is no exception in Section 26.2 for Section 27, besides the consequential damages, there's some other kind of damages they're entitled to get. They had no evidence of that before the district court. That's what we said. We said, therefore, they get only nominal damages. I think if Judge Johnson wanted to award them nominal damages, he would have awarded them $1. You're saying they settled. They settled that bit of the case, yes, Your Honor. But there was a settlement after the judge ruled. Is that what your position is? I think the judge offered them the opportunity to have further proceedings on damages. They did not take that opportunity. They chose instead to sign on to a judgment that we drafted that gave them only $1. Well, how come nobody ever characterized it as a settlement and wrote it down as a settlement agreement? I mean, if the lawyers were negotiating on a settlement agreement, it looks to me like they would have said so. Your Honor, we were settling. If they're negotiating on the contents of an order in conformity with the judge's ruling, it's another matter. I'm not going to try further. But I think if you look at page special appendix 3, you'll see that the judge did not dictate the particular outcome and left it to the parties to choose whether to write a judgment or whether to try and have further proceedings before the judge. And they chose the judgment, not further proceedings. But in any event, they never argued section 27.3 below. They never argued statistical significance below, and they misconstrued the entire contract. If you look at section 27.2.1, it says that Bell Atlantic Maryland or Verizon Maryland's performance is going to be reported and adjudicated or judged based on performance in the entire state of Maryland with all of the competitors that it's interconnecting with. And I'm not sure why, but this isn't in the joint appendix. But the performance reports specifically list competitor trunking. That is, the trunks, the facilities that carry traffic past each other. So if there was some argument about statistical significant violations, they could and should have made it below before the district court. But most importantly, section 26.2 does not carve out section 27. These parties... not these parties... CORE, as Mr. Gleeson said, picked off the shelf. They said, this is the agreement I want. It has a bar on consequential damages. They picked this contract, not Verizon. They didn't have to pick this contract. They could have said to the Maryland Commission, I want every bit of this contract but section 26, and we would have litigated that. You're saying it should be construed against them, then? It doesn't have to be construed against them. The drafting rule or the primary drafter or something? Your Honor, they lose on the plain language. I don't think there's any construction necessary. Section 26.2 unambiguously bars consequential damages in breach of contract claims and in negligence claims. It carves out intentional torts and gross negligence. But in a breach of contract claim and a negligence claim, consequential damages are barred. That's entirely consistent with Maryland law, which says you can't by contract, in some instances, completely eliminate negligence liability, and you normally can't eliminate liability for gross negligence and intentional torts. So as you read the exculpatory clause, you could have delayed for five years telling them, oh, you know, there's a retail customer connected and you can't connect. You could have played cat and mouse with them for five years, as we found you in breach before. Your Honor. And there would be no consequences. Your Honor, the consequences would be severe and drastic for my client if they did that. How would they be? The Maryland Commission and the Federal Communications Commission have substantial regulatory sanctions, up to and including the ability to deprive my client of the right to sell long-distance service to customers in the entire state of Maryland. Well, that's good, too, but that doesn't help the person who you wronged. Your Honor, that is a sufficiently severe sanction that it would make any carrier think twice. That would be in addition to making whole the person you wronged. Your Honor, what I can tell you is that when the Federal Communications Commission was presented with this same issue and it looked at a clause that precluded consequential damages for breaches of an interconnection agreement and a competitor said there should be an exception to that for violations of statutory duties, like the statutory duty to interconnect, the FCC said that competitor's proposal was commercially unreasonable and rejected it. So we know that the Federal Communications Commission does not think there is anything wrong with a provision like Section 26.2 that is voluntarily agreed to, and protects CORE as well, right? I mean, if CORE breaches the contract, Verizon can't go after CORE for consequential damages. This is a mutually agreed-upon bilateral provision that is recognized and permitted under Maryland law. It's permitted under federal law. And then there's an exception for intentional misconduct. We think only... Tell me, you know, tell me... The question I had, the Public Service Commission found the facts and... They found that it would have been very technically feasible to connect to the existing OC-12 and that you never initially claimed in declining the immediate connection that there was going to be a diminution in quality if an existing connection rather than a new connection was utilized. And you didn't disclose to CORE the fact that you had a customer record. And why don't... Do all of those PSC findings... Tell me why, in your view, you don't think that they are tantamount to intentional misconduct. I will, Your Honor, but first I'd like to point out that I don't read Section 26.2 to not apply or to exclude from its scope supposed intentional breaches of contract. Under the Maryland law that this is following, and it's the Wolf case, which cites the restatement of contracts and a case applying it, what's prohibited is using a contract to eliminate liability for gross negligence and intentional torts. Under Maryland law, carriers and parties, it's the Leet case, which is 620A2D. But you don't think an intentional breach of conduct is intentional misconduct? I don't think that's what it's meant to capture because, again, in Maryland, you are allowed to limit liability in this way for alleged intentional breaches of contract, and that's 620A2D, A2nd, 1372 at 1379-80. But even if that were the case, even if 26.2 excluded from its scope intentional breaches of contract, Verizon had a policy based on the way it ran its own network in order to protect its own customers. You have to remember that these interconnection facilities, they're used by thousands or tens of thousands of people to carry all sorts of calls, whereas the wire that runs to your house or my house obviously just serves us. Failures are horrible, and obviously carriers strive to avoid them, but a failure that affects my line affects me. A failure that affects a line that connects two networks or two major switching centers within a network affects tens of thousands of people. Verizon engineered those interconnection facilities to a much higher standard within its own network, and for the three years prior to Core attempting to get interconnection, this was the way Verizon was doing it with every other competitor in Maryland, right? eSpire, who Core was buying service from in 1997 to provide the same services it would provide once it switched over to become a competitive local telephone company, was interconnected in that same way. Verizon had a quite reasonable view that this was the way a telephone company should operate to ensure that those high-capacity, multi-user connections were redundant and safe. But you breached the contract. We were found to. I agree, Your Honor. Right, so they have questions whether or not it was an intentional breach. And I'd point out the hearing examiner found that our breach was because we refused to amend the contract. The Maryland Commission found that our breach was because we refused to accept Core's request as a waiver of the contract. This Court found that we breached the contract. The District Court found that we didn't. I don't think you could find that Verizon having that policy and that belief about the appropriate way to interconnect was malicious. The intentional misconduct phrase has got to be something more than a simple breach. There has to be a difference between those two concepts. And the District Court says, okay, there's been an adjudication of a breach, but there has to be something that really, something of a greater nature to rise to the point where consequential damages are awarded, that the exception, that the preclusion of consequential damages in what I guess is 26.2 is meant to be an exception rather than a rule and that it's historically been the case that limitations on consequential damages are permissible. They're legitimate provisions. The Public Service Commission permits them. So the real question here is a judgment call as to whether the behavior in this point was sufficiently egregious to bring in the exception. But it is supposed to be an exception. It's not supposed to cover the normal situation. So tell me just in plain language why this is a garden variety breach. There was a disagreement, but it's the law of the case now as a result of our previous decision that there's been a breach. So your burden is to say why it's a garden variety breach as opposed to something that bumps up several levels to the point where consequential damages are awarded. And I'd like to just tell me in plain terms why your client's contact is not egregious. That's the whole ball of wax. Absolutely, Your Honor. So as to the policy that said we're going to use dedicated facilities and not retail facilities for interconnection, that's something that Verizon had done successfully with other competitors in Maryland and other states prior to 1999. It was how eSpire, for example, was interconnected. Yes, there was obviously a disagreement, and we lost on that disagreement though in a variety of ways along the way, although most recently CORE cites a more recent decision from the Maryland Commission which found that our policy was not actually in breach of their Damascus agreement. So I don't think you can look at the fact that Verizon had this policy and suggest that it was doing something nefarious. Well, they're suggesting that you have a habit of doing this. Well, we had a policy because it was the way Verizon's engineers thought telephone networks should be built for the benefit of customers. And that's, I think, maybe it turned out it violated the contract, but I don't think having that policy is in any way nefarious. That's right. It does violate the law when your policy runs counter to your duty to interconnect with local telephone carriers. Your Honor, I would agree with you on that one. That's exactly why you can't hide under your policy to say we're going to effectively write that out. And I think, Your Honor, it was a... So would you please just continue answering Judge Wilkerson's question? I will. It was a... My point, Your Honor, it was a good-faith disagreement. There is no evidence that Verizon adopted that policy with an intent to hinder or delay competitors. To the extent it was a breach, companies disagree about what their contracts mean all the time. The problem was not the difference in how you connected retail and commercial. The gravamen is whether or not you purposely avoided and did not or concealed the fact that you were telling them on one hand, oh, we can't connect you because there's a retail customer connected, presumably knowing all along that they were the customers and could have easily done so. That's the question. Let me get to that, Your Honor. Why is that not just lying? Well, first of all, Your Honor, they withdrew their claim of affirmative misrepresentation. It's in footnote 2 of the judge's opinion, and that's at page 628 of the joint statement. Let's assume for the... There's no waiver. Just answer that question. Why is that not evidence of deliberate... Let me finish my question. The question is, why is that not evidence that you deliberately misled CORE by not telling them that they were the supposed retail customer that prevented you from complying with the federal law of interconnection? That's the question. Your Honor, there is literally no evidence that we told them anything other than that there was a retail customer. We did not. There is no evidence that we told them that it was a customer other than CORE. They made that assertion, and they withdrew it. I didn't know that it was the customer. Of course CORE knew it was the customer. Mr. Mingo had gone to the site. I mean, if CORE was the customer, why wouldn't they be aware of that? I have no idea. But if you look at the letter that Mr. Vandenberg sent, and this is at page 469 of the joint appendix, it's in the 1, 2, 3, 4th full paragraph, CORE says not Verizon. Please tell us who the retail customer is. CORE says we are working with our existing retail telecommunications service provider, i.e. eSpire, to identify that existing customer. So CORE didn't say please tell us who it is. CORE said we're going to figure it out ourselves. There is no evidence that Verizon did anything other than say this is cataloged in our system as a retail facility. Let me ask you something else on this. Judge Motz in the district court level made some comments about, well, he found that there was absolutely no bad faith on your part or no intentional misconduct. But he got a little bit, he dug in a little bit and started, he obviously didn't like the fact that the prior case had adjudicated a breach. And he said, well, appellate courts don't find facts, et cetera. Is the district judge digging in against the mandate here? No, Your Honor. The mandate, this court found that we breached the contract and it remanded for the judge to further consider whether CORE had a stand-alone claim for the breach of the implied duty of good faith and fair dealing in the contract. He adjudicated that, allowed CORE to attempt to present its damages case. And Judge Motz found that, but you don't, he wasn't just digging in. No, Your Honor. And again, CORE didn't put in evidence. CORE asserted that somehow this court's background section of its opinion entitled the summary judgment on its tort claims. When tort claims were never litigated in front of the Maryland Commission, the Maryland Commission had no reason to consider issues of intent or issues of reliance. What do you do with the Public Service Commission finding? Well, Your Honor, the Public Service Commission said we breached the implied duty of good faith and fair dealing. What do you do with that finding? You do two things with it. First of all, we won on that issue. We won on it initially in front of Judge Motz and after remand, we won on it again because there is no such thing in Maryland as a standalone breach of a duty of good faith and fair dealing. But most importantly, under Maryland law, all that breaches is it's an implied contract term. There's no intent element to it. I mean, I know it's like fraudulent joinder, Your Honors. Fraudulent joinder is something you can do without any malice or you just make a mistake. You pick a defendant who it turns out you really don't have a claim against. Not because you're really trying to stay out of federal court because you made a mistake. The breach of the implied duty of good faith and fair dealing does not mean you acted in bad faith. All it means is you did a breach of the contract that, like all breaches, denies the other party one of the benefits of the bargain. So you can't look at that reversed, again, and conceitedly reversed. The district court's opinion makes clear the court agreed that it had no standalone claim and the Maryland Commission had no legal basis for that claim. You can't conclude from that a factual finding that's binding, especially in light of all the evidence that come to light, that Verizon was acting in a malicious way that might trigger an exception under Section 26.2. Your Honors, in my time that's... Is there anything further? Just a couple of things. I'd like to... The delay was three months at most. It was not four to six months to the extent that's relevant. I think it is, as the FCC found in the Cavalier case... We rely on the relatively short period of the delay as an additional indicia of the fact that there is no bad faith. Actually, I just wanted to clear up the record so that the court was not... The delay, but does the length of the delay speak to the question of intentional misconduct? Your Honor, I think the relevant... The only relevant thing I draw from that, and this is in the record in the prior case, is that in building the dedicated facilities for Cork, Verizon did it faster than it did it for everyone else that it was building those for at the time. So I do think that that suggests that we were not acting in a dilatory or pernicious manner. Summary judgment, wasn't it? What was summary judgment? Wasn't summary judgment granted by the district court? Summary judgment was granted on the damages issues, yes, and on the question whether... But all factual inferences are to be in the favor of whom? Your Honor, they would go in favor of... I was just... Exactly, but you're talking about a whole lot of facts that we just need to accept, like, three months is automatically not... Go in the facts and give them the... You'd give them the six months, wouldn't you? Well, Your Honor, all I'm saying is that this court questioned... Can you ask the question that I was very interested in? For summary judgment purposes, you'd be willing to give them the six months, wouldn't you? Your Honor, your prior opinion states the relevant dates. I was just clarifying the oral argument transcript so there was no confusion. Not every question is a hostile question. Some of them are, but... They're entitled to the facts on summary judgment, whatever they are. I'm not saying the facts on summary judgment... They're not entitled... If there's a question of whether it's three months or six months, they get it. Okay, that's true, but my point was simply that there's no question. It might not make any difference, but they get it. My point was only that there was no question. No question about what? About the length of... There's no question it's three months. Exactly, there's no question it's three months. All right, no evidence at all to say it's for six months. No, it was requested to be done in mid-September. But how is it part of the law the six months delayed is not evidence that you were intentional... Okay, just so I can be clear on my answers. There was a question asked of Mr. Gleaton as to how long the delay was. The record is absolutely clear, and there's no dispute. CORE wanted the interconnection to be in place by mid-September. It was in place by mid-December. So that's not six months. That's three months. The second question Judge Wilkinson asked is, well, is that relevant to intent? And it's obviously not something that the district court relied on one way or the other, but I was simply adding because I got a question. I mean, if it would make a difference to me if it were three months as opposed to 18 months or not just in terms of damages, but also in terms of whether 26.2 kicks in. And I was simply noting that the prior record in this case, which is, of course, the record, I suppose technically it's still part of the record here. The undisputed facts were that Verizon completed this faster for CORE than for other people. All right, thank you. That's all I was trying to make. Appreciate it. And we need some rebuttal here from Mr. Glynn. Thank you, Your Honor. On the contract issue, the real reason that we are here on the contract or exculpatory clause issue is a failure of imagination. Neither Congress, when it passed the law, the FCC, when it promulgated the rules, the Maryland Public Service Commission, when it has been interpreting these rules, or even the lawyers who drafted this contract that CORE has accepted, imagined that an ILEC might refuse to interconnect, which is what Verizon has been found to have not have breached the contract by. Because they have failed to imagine that they would refuse to interconnect, there are no provisions that talk to it. I'm not sure I find that very persuasive that you say that we're supposed to resolve this on the basis of Congress's failure of imagination. No, I'm saying that the contract itself, because it goes from the Congress down to the contracts, there's no provision for what happens if they fail to connect. Well, that's because they left some things to be negotiated between the parties. Congress wasn't trying to write these contracts. And so, you know, all the eventualities that might arise, including a refusal to connect, that's the whole point of the contract. The whole scheme isn't set up for Congress to draft the contract. Congress left it to the parties, to the established company, and then to the new arrival. And said, okay, you negotiate the terms of your relationship yourself. And it does, but as GlobalNaps tells us, the interconnection portion was a duty and not a service. So we contract our service, and we contract how you were to do your duty of interconnecting with us. But we don't imagine that we're not going to interconnect. We imagine what will happen after we interconnect the services port. And we have things like 26.2, which tells us what our remedies are. You've got contractually, it's perfectly fair to say that you should take a look at the eventuality that there may be a delay in the connection. And if that were in the contract anywhere, I would agree with Your Honor. But the interconnection, it talks about 27.1, which is what this court found Verizon breached. And 27.3 says we're allowed to apply to a court and does not limit us away from consequential damages. It's 26.2 that does that, and 26.2 talks about services. Again, the bridge is connection, allowing the cars to cross back and forth to transport information and to terminate information. That is the service. 26.2 tells us what happens when the service is poor. It doesn't tell us what happens when they just refuse to interconnect. Mr. Blaser, you have a hard case where you come to the Fourth Circuit and you win that there's a breach. Then you go back to the district court, and the district court says, I'm going to grant summary judgment on your damages. That's a case that we really have to look very carefully at because we want to make sure that our mandates are being carried out. You're right. Yeah, so you'd be arguing their factual questions. My goodness, you win there's a breach. Now, it seems like this case, Verizon is almost, most of their argument is still arguing whether or not they actually breached. Correct. Almost. Most of it, whether he was arguing about it, was whether or not there's a breach. They're still arguing with that. It seemed like the district court was still involved in that. Why don't you not argue their factual questions about your damages? Okay, well, there's obviously factual questions about our damages. We have a very lengthy expert damages report filed in a sealed version, and there are going to be fights about what our damages are, and we should be able to get in front of a jury and figure out what our damages are. Is that what you want? You want to set back this for a jury trial, right? Absolutely, Your Honor. Right. Even on the tort claims, we're not asking, and though, yes, we briefed it, we're not asking for a summary judgment that we win. We're asking for a summary judgment that we get a jury trial. How many experts you got? One expert, which is one more than they had. One more than they had. It's only one expert. Yes, Your Honor. But the report's all sealed. We can't see that. Well, you can. It's available to you. But it's sealed in the record, but it's available to you. And so you've got that expert. They're disagreeing with our damages, which I understand, and that's what a jury should be about. To the point, I can't imagine. Why were you arguing about imagination is clear. That's what federalism is. Yes, Your Honor. That's why if Maryland law takes care of the damages and knows whether or not there's a tort and whether or not that, and the federal law is an outside duty, which amounts to perhaps a fiduciary duty, and that's why the torts sometime arise out of it. And that's where I was trying to go, Your Honor. Judge Motz reversed himself. He initially said that the expropriatory clause cannot stand, but he said that it cannot stand because it frustrates the federal statute. Verizon came along and said that we didn't argue that. Motion to reconsider. Say again? That when you came back on the motion to reconsider. Yes, Your Honor. Okay. And Verizon said that CORE did not argue that. And they're right. We didn't argue it. And the reason we didn't argue it then and we didn't argue it in our brief here is because I cannot find a case that I can put before this court that says frustration of statute is a reason for us to win. But I would argue that Judge Motz was right. Not allowing damages absolutely frustrates the statute, and I would argue that he should not have reversed himself, that our motion is an application for an order, and even if we did not brief it, he is allowed to find for us for any legal reason he finds fit. And I would argue that this court should find that not allowing damages frustrates the statute and does not give it any force or effect. Because Verizon says that there was a mistake. No, because their company is big and they have their own standards of connection, and they may be right. No one is saying anybody lied. The question is these are factual questions as to whether or not it amounts to it, and you're entitled to a jury trial. That's what we're saying. That's the argument. Right. We're saying that their argument, that our one hand didn't know what the other hand was doing, was good until we sent the letter. We're saying that there are plenty of factual issues about what our damages should be, and not to bring it up again, but we're saying there are factual issues as to whether or not we should be allowed to get our tort claims in Maryland law, even if Fourth Circuit law does it, Maryland law allows it. Does that have to be a tribal issue of fact as to their intentional misconduct? Yes, Your Honor. But we're arguing that the facts, as are in the record, the 14-year record of this case, are plenty to get us there. And this is a recalcitrant teenager. They're certainly imputed with knowledge as to who the retail customer is, correct? Say again, Your Honor? They're imputed with knowledge as to who the retail customer was that was blocking you. Yes, Your Honor. They have to be imputed with that. I would argue they're imputed with it to begin with, but to the extent that they're going to argue that they did not know, that the retail and the wholesale divisions didn't know what each other were doing, when we sent the letter on August 20, 1999, they had a duty at that point for the retail division and the wholesale division  So I agree with Your Honor that they breached a duty before we sent the letter, but they definitely breached it after we sent the letter. Thank you, Your Honor. All right, we will come down and greet counsel, and then we will proceed after a very brief recess into our final case. The court will take a brief recess.
judges: J. Harvie Wilkinson III, Robert B. King, Roger L. Gregory